**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN NIMROD, | ) | CASE NO. 1:20-CV-678 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.,* | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Brian Nimrod ("Plaintiff"), challenges the final decision of Defendant Kilolo

Kijakazi, Acting Commissioner of Social Security ("Commissioner"),[1] denying his application

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i), 423 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case

is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R.

10). For the reasons set forth below, the Commissioner's final decision is REVERSED and

REMANDED for proceedings consistent with this opinion.

**I. Procedural History**

On November 30, 2016, Plaintiff filed his application for DIB, alleging a disability onset

date of November 7, 2016. (R. 14, Transcript ("Tr.") 190-191). The application was denied

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a
party." Fed.R.Civ.P. 25(d).

initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 105-143). Plaintiff participated in the hearing on October 11, 2018, was represented by counsel, and testified. (Tr. 75-104). A vocational expert ("VE") also participated and testified. *Id*. On February 7, 2019, the ALJ found Plaintiff not disabled. (Tr. 68). On February 4, 2020, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-7). Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 17 & 18).

Plaintiff asserts the following assignments of error: (1) the ALJ erred in the weight assigned to the opinions of Dr. Scott Feudo and Nancy Blake, LISW, and (2) whether substantial evidence supports a finding that Plaintiff's migraine headache was a severe impairment. (R. 17).

## II. Evidence

### A. Relevant Medical Evidence[2]

#### 1.  Treatment Records

On November 16, 2016, Plaintiff was seen by Anum Riaz, M.D., and Edward Westbrook, M.D., for a neurological evaluation regarding new episodes of seizures. (Tr. 305-309). Treatment notes indicate Plaintiff "was last seen on August 24th. At that time, it was unclear the etiology/characterization of spells, though suspect 2/2 combination of Lexapro/Lamictal vs. complex migraines vs. syncope vs PNES [psychogenic nonepileptic seizures]." (Tr. 305). The physicians were "[u]nsure of cause of symptoms at this time. Suspect potentially related to lab

---

[2]  The recitation of the evidence is not intended to be exhaustive, as the facts are adequately set forth in the briefs. The court also foregoes any recitation of the hearing testimony, as Plaintiff has not expressly challenged the ALJ's credibility analysis or the ALJ's reliance on the VE's testimony.

abnormalities causing fatigue vs. sleep disturbances vs. nonorganic [symptoms]." (Tr. 308).

Recommendations included lab studies, a sleep study, and neuropsychological testing. *Id*.

On November 18, 2016, Plaintiff saw his primary care physician, Scott Feudo, M.D., for his

yearly physical. (Tr. 301). Plaintiff reported frequent episodes of blank stares, headaches fifteen

times per month, fatigue, tremors, and intermittent memory episodes. *Id*. Neurological

examination was normal except for diminished vibratory sensation in the big toes and the right

upper extremity, 1+/4 reflexes bilaterally, slightly positive Dix-Hallpike maneuver, and positive

fatigability. (Tr. 303). Dr. Feudo diagnosed vasovagal syncope,[3] alteration of awareness, and

chronic fatigue syndrome. *Id*.

On December 20, 2016, Plaintiff participated in a sleep study. (Tr. 333-335). Plaintiff was

prescribed the use a BiPAP machine with a mask, encouraged to lose weight, and discouraged

from using alcohol or sedatives. (Tr. 334).

On December 29, 2016, Plaintiff presented to Dr. Feudo after his recent sleep study. (Tr.

591). Plaintiff again reported generalized fatigue, chronic short-term memory loss, frequent

episodes of disorientation, and chronic intermittent episodes of staring blankly. *Id*. Dr. Feudo

urged Plaintiff to begin using his BiPAP device as soon as possible and to schedule

neuropsychological testing. (Tr. 593).

---

[3] "A vasovagal episode or vasovagal syncope is the most common form of reflex syncope.
Reflex syncope describes any form of syncopal episode caused by a failure in the autoregulation
of blood pressure, and ultimately, a drop in cerebral perfusion pressure resulting in a transient
loss of consciousness. The mechanisms responsible for this are complex and can [involve] both
depression of cardiac output as well as decreased vascular tone. Other types of reflex syncope
include carotid sinus syncope and situational syncope, the latter of which may occur, for
instance, in conjunction with a cough or micturition. Vasovagal syncope may be triggered by
pain or emotional upset, although frequently a specific trigger cannot be identified."
https://www.ncbi.nlm.nih.gov/books/NBK470277/

On February 1, 2017, Plaintiff reported no episodes of staring blankly since his last office visit. (Tr. 539). However, Plaintiff continued to report generalized fatigue, chronic short-term memory loss, frequent disorientation, and headaches. *Id*. Dr. Feudo diagnosed vasovagal syncope, alteration of awareness, obstructive sleep apnea, bipolar disorder, and chronic fatigue syndrome. (Tr. 541).

On February 23, 2017, Plaintiff treated with Dr. Riaz for complaints of memory loss. (Tr. 553). Plaintiff reported the staring spells have continued but had become steadily briefer, and he remained aware and responsive throughout the episodes. (Tr. 555). Dr. Riaz diagnosed memory deficit, anxiety, and history of multiple concussions. *Id*. (Tr. 555).

On March 14, 2017, Plaintiff was seen by Colleen Lance, M.D. (Tr. 370-373). She noted a history of bipolar disorder, seizures, chronic fatigue, and recently diagnosed obstructive sleep apnea. (Tr. 370). Dr. Lance's impression was severe apnea, and she recommended increasing pressure of his BiPAP machine. (Tr. 373).

On March 22, 2017, Plaintiff was seen by Dr. Riaz and Dr. Westbrook for a follow-up examination. (Tr. 557). Plaintiff had a "questionable h/o seizures (never seen on EEG), who is following up in Neurology Clinic today for excessive fatigue, disorientation." (Tr. 560). Plaintiff's spouse reported fewer blank staring episodes. (Tr. 557). Plaintiff reported increased migraines. *Id*.

On March 24, 2017, Plaintiff was seen by Philip S. Fastenau, Ph.D., for a follow up to review the results of a neuropsychological examination performed on February 23, 2017. (Tr. 384-385). On mental status examination, Plaintiff was "alert and oriented, with normal gait, fine motor control, speech, expressed thought content, and insight, and there were no apparent lapses in judgment. Mood appeared euthymic, and affect was appropriate to content and context. Mr.

Nimrod described his mood as 'edgy' and denied anhedonia, hallucinations and suicidal/homicidal ideation; there was no evidence of delusions." (Tr. 389). Dr. Fastenau indicated Plaintiff "appeared to give good effort on all tasks" and considered the exam results as "reliable and valid." *Id*. Plaintiff scored "below expectation" on measures of fine motor speed/dexterity and on some measures of mental processing speed, but "other measures that are dependent on psychomotor speed and mental processing speed were normal, if not proficient." (Tr. 389). With respect to memory measures, Plaintiff's "recall improved over time on some measures … and with cues and recognition formats to facilitate retrieval." *Id*. On another memory and learning test, Plaintiff "demonstrated a strong capacity to acquire and retrieve new information in the form of a long list of words." *Id*. Dr. Fastenau concluded that Plaintiff overall "demonstrated a normal, if not strong, capacity for acquisition, retrieval and retention of new information, scoring in the average to high average range on key indices across all measures." *Id*. Plaintiff performed at expected levels on all other measures, including attention/concentration, receptive and expressive language, spatial perception and construction, executive functioning such as impulse control, mental flexibility, generativity, verbal reasoning, and visual-spatial reasoning. (Tr. 389-390). Dr. Fastenau noted that "[v]ideo EEG monitoring reportedly captured one episode with no electrophysiological correlate and evidenced no epileptiform activity." (Tr. 390). Dr. Fastenau explained that Plaintiff's "profile on the neuropsychological exam could be explained by sleep disorder, mood disorder, anxiety and/or stress. We cannot rule out the possibility of a subcortical neurological condition." *Id*. He concluded that exam findings were "consistent with diagnoses of memory retrieval inefficiency," and psychomotor slowing in the context of obstructive sleep apnea and anxiety." *Id*.

On May 15, 2017, Plaintiff reported to Dr. Feudo "that he has been using a new BiPAP

machine over the past 3 weeks" with improved energy and "some improvement in short-term memory since he began use of the new machine." (Tr. 627). Plaintiff and his spouse reported continued chronic intermittent episodes of disorientation since his last office visit, but decrease in frequency of the episodes since he began using the new BiPAP machine. *Id*. Detailed neurological exam was normal except for reflexes 1+/4 bilaterally. (Tr. 629). Dr. Feudo diagnosed central sleep apnea, migraine headaches, chronic fatigue syndrome, and malaria. *Id*.

On November 27, 2017, Plaintiff was seen for his annual physical. (Tr. 694-698). Plaintiff reported intermittent episodes of sharp pain in the left shoulder region, intermittent episodes of tremors in the right hand, chronic cognitive impairment, and frequent episodes of disorientation. (Tr. 695). Neurologic examination was normal except for the following: "Vibratory sensation slightly diminished right thumb[,] Strongly positive Romberg noted[,] Reflexes 1+/4 bilaterally[,] Dix-Hallpike maneuver slightly positive with rotation bilaterally possibly latency, positive fatigabilily, positive habituation." (Tr. 697). Dr. Feudo diagnosed chronic fatigue syndrome, hypersomnia, obstructive sleep apnea, vasovagal syncope, and vitamin D deficiency. *Id*.

On March 21, 2018, Plaintiff was seen by Dr. Feudo complaining of side effects of his migraine medication. (Tr. 690). He did indicate that the medication reduced his headaches to two or three over the past two months. *Id*. Plaintiff made no complaints of staring episodes or memory issues. (Tr. 690-693). Plaintiff's diagnoses included migraine headaches, memory deficit, PTSD, psychomotor deficit, bipolar disorder, and chronic fatigue syndrome. (Tr. 692).

## 2.  Medical and Non-Medical Opinions Concerning Plaintiff's Functional Limitations
### a. Physical Limitations

On April 27, 2017, State Agency physician Obiaghanwa Ugbana, M.D., reviewed the

medical evidence and completed a physical residual functional capacity (RFC) assessment. (Tr. 111-112). Dr. Ugbana opined that Plaintiff could occasionally lift and/or carry 50 pounds and frequently 25 pounds; could stand and/or walk and sit for six hours each out of an eight-hour workday; could never climb ladders/ropes/scaffolds; could frequently climb ramps/stairs, stoop, crouch, crawl and kneel; and, should avoid all exposure to hazards. *Id*. Dr. Ugbana assessed no manipulative, visual, or communicative restrictions. (Tr. 112).

On August 15, 2017, State Agency physician Maureen Gallagher, D.O., essentially agreed with Dr. Ugbana's limitations, but also limited Plaintiff to only frequent reaching overhead with the left upper extremity. (Tr. 131-133).

On June 5, 2018, Dr. Feudo completed a checklist-style medical source statement concerning Plaintiff's physical capacity. (Tr. 825-826). Dr. Feudo indicated Plaintiff could lift ten pounds occasionally, but did not indicate how much Plaintiff could lift frequently. (Tr. 825). Dr. Feudo further opined that Plaintiff could stand/walk for four hours in an eight-hour workday, but was not limited in his ability to sit. *Id*. He also stated that Plaintiff could rarely perform any postural or exertional activities, and could rarely reach, push/pull, or perform fine and gross manipulation. (Tr. 825-26). Dr. Feudo indicated Plaintiff needs to be able to alternate positions at will, and that Plaintiff does not experience pain. (Tr. 826). Finally, Dr. Feudo indicated Plaintiff required an additional one-hour break. *Id*. The form asked Dr. Feudo to identify the medical findings supporting each set of restrictions. (Tr. 825-826). Although Dr. Feudo appears to have written down the same brief response to most of these queries, the court finds his writing wholly illegible save for the possible phrase "2 to impairment." *Id*.

**b. Mental Limitations**

On April 25, 2017, State Agency psychologist Robyn Murry-Hoffman, Ph.D., reviewed the

records and completed a mental RFC assessment. (Tr. 113-115). Dr. Murry-Hoffman opined

Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed

instructions, but could "perform simple, repetitive, one to two step tasks." (Tr. 113-114). She

further opined Plaintiff had moderate limitations in his ability to maintain attention and

concentration for extended periods. (Tr. 113). She also indicated Plaintiff was moderately limited

in his ability to accept instructions and respond appropriately to criticism from supervisors, but

could "perform tasks that require no more than superficial social interactions with co-workers,

supervisors, and the public." (Tr. 114). Finally, she opined Plaintiff was moderately limited in

his ability to respond to changes in the work setting, but could "perform tasks that require

infrequent changes and no strict production quotas." *Id*.

On August 15, 2017, State Agency psychologist Katherine Fernandez, Psy.D., reviewed the

records and completed a mental RFC echoing Dr. Murry-Hoffman's findings. (Tr. 133-135).

On May 11, 2018, licensed social worker Nancy Blake, LISW, completed a checklist-style

medical source statement related to Plaintiff's mental impairments (Tr. 713-714). Ms. Blake had

been seeing Plaintiff for psychotherapy since March 2, 2018—three months before completing

the form. (Tr. 714). Ms. Blake checked boxes indicating Plaintiff had marked limitations in 5 of

7 areas in the category of understanding, remembering, and applying information; an extreme

limitation in his ability to handle conflicts with or to keep social interactions free of excessive

irritability, sensitivity, argumentativeness or suspiciousness; marked limitations in 4 of 8 areas in

the category of concentration, persistence, and maintaining pace; and extreme limitations in his

ability to respond to demands and manage his psychologically based symptoms. (Tr. 713-714).

Ms. Blake explained that Plaintiff "has had multiple episodes of collapse and disengagement in

which he is unaware of his surroundings. He has experienced extensive trauma and current

symptoms meet criteria for [PTSD] with dissociative symptoms (F43.10); anxiety (F41.9); and

depression (F32.9)" with bipolar disorder also under consideration. (Tr. 714).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes

disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of*

*Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he

cannot perform "substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a)

and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage

process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First,

the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at

the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the

claimant must show that he suffers from a medically determinable "severe impairment" or

combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c)

and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental

ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not

performing substantial gainful activity, has a severe impairment (or combination of impairments)

that is expected to last for at least twelve months, and the impairment(s) meets a listed

impairment, the claimant is presumed to be disabled regardless of age, education or work

experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s)

does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§

404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since November 7, 2016, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: epilepsy, complex sleep apnea, osteoarthritis, bicipital tendonitis, bipolar disorder, post-traumatic stress disorder, and vasovagal syncope (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) subject to the following limitations: (1) limited to frequently pushing/pulling with the left upper extremity; (2) limited to frequently climbing ramps and stairs; (3) can never climb ladders, ropes, or scaffolds; (4) limited to frequently stooping, kneeling, crouching; (4) [sic] limited to occasionally crawling; (5) limited to no more than occasional overhead reaching with the left (non-dominant) upper extremity; (6) must avoid all exposure to hazards and motorized machinery; (7) limited to performing simple, repetitive, one to two step tasks; (8) limited to performing tasks that require no more than superficial social interactions with co-workers, supervisors, and the public; (9) limited to performing tasks that require infrequent changes and no strict production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on ***, 1977 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from November 7, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 56-68).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ

failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6ᵗʰ Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

### 1. Weight Assigned to the Opinions of Dr. Feudo and Social Worker Blake

In the first assignment of error, Plaintiff argues the ALJ erred by giving little weight to the opinion of Dr. Feudo and no weight to the opinion of social worker Blake, opinions that he believes were supported by, and consistent with, the record. (R. 17, PageID# 1018).

#### a. Dr. Feudo

Plaintiff contends the ALJ erred in his consideration of Dr. Feudo's opinion, because "[i]t is well-established that ALJs may not make medical judgments… and the ALJ exceeded his role by exercising medical expertise [he] did not have in interpreting raw medical data to determine Plaintiff's residual functional capacity." (R. 17, PageID# 1019, citing *Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6ᵗʰ Cir. 2006)). The Commissioner does not challenge Dr. Feudo's status as a treating physician. (R. 18). The Commissioner concedes that new regulations abolishing the treating physician rule are "prospective and do not apply to this case," as Plaintiff's claim was file on November 30, 2016.[4] (R. 18, PageID# 1038, n. 1). Nevertheless, the Commissioner asserts the ALJ provided good reasons for according only "some weight" to Dr.

---

[4]  The new regulations apply to claims file on or after March 17, 2017. *See* 20 C.F.R. §§ 404.1520c; 416.920c.

Feudo's opinion. (R. 18, PageID# 1038).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5).

The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). "An example of a good reason is that the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'" *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v.*

13

*Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6ᵗʰ Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6ᵗʰ Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Because it is not in dispute that Dr. Feudo professionally treated Plaintiff in his capacity as a physician, the ALJ was obligated to provide good reasons for rejecting limitations contained in a medical source statements to the extent they were inconsistent with the RFC. The decision addressed the June 5, 2018 opinion from Dr. Feudo as follows:

> Dr. Scott Feudo provided a medical source statement on behalf of the claimant, which was extremely restrictive, calling for essentially a less than sedentary[5] residual functional capacity. (Ex. 21F). The undersigned gives little weight to the assessment of Dr. Feudo as his opinion does not assist the adjudicator in arriving at a function-by-functional residual functional capacity based on plausible evidence that he cites, or that exists anywhere in the medical record. It is nearly unfathomable that Dr. Feudo could arrive at such an overly restrictive residual functional capacity based on the very limited objective medical evidence of record. The claimant's chief complaint has been his purported seizure disorder, although claiming this disorder as a disabling impairment is insufficient because objective neuropsychological testing was nearly entirely normal. (Ex. 6F).

(Tr. 65).

The ALJ's characterization of Dr. Feudo's opinion as "unfathomable," "overly restrictive,"

---

5  It is not entirely clear why the ALJ characterizes the RFC as "essentially less than sedentary." (Tr. 65). Dr. Feudo opined that Plaintiff could lift 10 pounds occasionally, stand/walk for four hours, and sit without limitation. (Tr. 825). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. 404.1567(a). " 'Occasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Social Security Ruling (SSR) 83-10, 1983 SSR LEXIS 30, *13, 1983 WL 31251 at * 5 (1983).

and not supported by "objective medical evidence of record" amount to nothing more than a series of conclusions that, on their own and without further explanation, fail to satisfy the treating physician rule. Although the ALJ may reasonably have concluded that the limitations assessed by Dr. Feudo were not supported by his own treatment notes or other objective evidence of record, the ALJ fails to draw the court's attention to inconsistencies between Dr. Feudo's medical source statement and treatment notes or other opinions, nor does the ALJ provide any meaningful explanation for such a conclusion.[6]  Courts routinely find that perfunctory assessments of treating source opinions do not constitute "good reasons" for their rejection. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely concluded, without explanation, that the evidence of record did not support the severity of the assessed limitations); *Patterson v. Astrue*, 2010 WL 2232309 at *14 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.") (Vecchiarelli, M.J.); *Fuston v. Comm'r of Soc. Sec.*, No. 1:11-CV-224, 2012 WL 1413097 at *9 (S.D. Ohio Apr. 23, 2012), *report and recommendation adopted*, 2012 WL 1831578 (S.D. Ohio May 18, 2012) ("To facilitate meaningful judicial review the ALJ must state the evidence considered which supports his conclusion.")

In addressing Dr. Feudo's opinion, the ALJ also noted that Plaintiff's primary "complaint

---

[6] This opinion should not be construed as suggesting that Dr. Feudo's medical source statement should be ascribed any particular level of weight. It is admittedly contained in a checkbox format with limited explanation. However, the ALJ did not adequately discuss how the evidence fails to support the opinion in question.

has been his purported seizure disorder, although *claiming this disorder as a disabling impairment is insufficient* because objective neuropsychological testing was nearly entirely normal." (Tr. 65) (emphasis added). Earlier in the ALJ's decision, when addressing the claimant's RFC at Steps Four and Five of the sequential evaluation, the ALJ indicated that:

> This case is governed by SSR 87-6. This ruling sets forth standards for analyzing cases in which an individual alleges disability on the basis of seizure disorder. The ruling provides that epileptic seizures are normally subject to good control with medication, and that such a disorder should not be considered disabling in the absence of objective serological testing indicating that the level of anticonvulsant medication has been at a therapeutic level when the individual's seizures occur.

(Tr. 62). SSR 87-6, 1987 WL 109184 (Jan. 1, 1987) addressed "The Role of Prescribed Treatment in the Evaluation of Epilepsy." However, SSR 87-6 was rescinded as obsolete years before the ALJ's decision. *See* Rescission of Soc. Sec. Ruling 87-6; Policy Interpretation Ruling; Titles II & XVI: The Role of Prescribed Treatment in the Evaluation of Epilepsy, SSR 87-6, 2017 WL 898572 (S.S.A. Mar. 3, 2017). Revisions to the listings concerning neurological disorders incorporated "portions of [SSR] 87-6 … that continue to be relevant to the treatment of epilepsy." 81 FR 43048-01, 2016 WL 3551949 (Jul. 1, 2016). It is unclear why, or in what manner, the ALJ was applying an obsolete SSR that addressed whether an impairment met the listing requirements at Step Three of the sequential analysis. "[T]he finding at step three is not a residual functional capacity finding [as] … [t]hat finding is formulated at step four," the Listings are "at step three." *Wood v. Comm'r of Soc. Sec.*, No. 19-1560, 2020 WL 618536, at *3 (6th Cir. Jan. 31, 2020). If the ALJ believed Plaintiff's functional limitations could not be considered because they stemmed from a medical condition that did not satisfy a listing, such a conclusion would be erroneous.

Still more perplexing, the ALJ expressly designated both epilepsy and vasovagal syncope

as severe impairments. (Tr. 57). In crafting the RFC, the ALJ indicated "[i]n consideration of the claimant's complaints seizure like spells, he should only frequently stoop, kneel, crouch and occasionally crawl." (Tr. 66). Despite the ALJ's own findings, the decision seems to cast doubt on Plaintiff's "purported" seizures to discredit Dr. Feudo's opinion. (Tr. 65). The decision is internally inconsistent, and this reviewing court cannot discern what the ALJ intended. As a rule, the ALJ must build an accurate and logical bridge between the evidence and the conclusion. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004). "Where the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Castello v. Commissioner of Social Sec.*, 5:09 CV 2569, 2011 U.S. Dist. LEXIS 13659, 2011 WL 610590, at *2 (N.D. Ohio Jan 10, 2011) (quoting *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007) (internal quotation omitted); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow reviewing court to trace the path of her reasoning) (*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)). If the ALJ intended to find that there was no medical evidence that Plaintiff suffered from seizures or similar symptoms, other than his subjective statements to medical personnel, the ALJ did not clearly do so *and* explain his reasoning in a manner that is clear to this court.

Finally, the ALJ appears to conclude that an individual with "neuropsychological testing [that] was nearly entirely normal" either would not suffer from seizures or would not have seizures as severe as Plaintiff alleged. (Tr. 65). This conclusion amounts to an impermissible medical judgment that neither the ALJ nor the court is qualified to make. The ALJ points to no medical source who makes this conclusion. As one court of this district has observed, a remand is appropriate under several circumstances, including where "the ALJ interpreted raw medical

17

data on his own, rather than accepting medical opinions of record or consulting a ME." *Young v. Comm'r of Soc. Sec.*, No. 1:10-cv-2900, 2012 WL 4505850, 2012 U.S. Dist. LEXIS 140015 (N.D. Ohio, Sep. 28, 2012) (Knepp, M.J.) (*citing Roso v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 28308, 2010 WL 1254831, *13, *adopted by* 2010 U.S. Dist. LEXIS 28289, 2010 WL 1254833 (N.D. Ohio 2010)). "[U]nder Sixth Circuit case law, an ALJ impermissibly 'plays doctor' when he rejects a treating physician's opinion as 'implausible'" based on the ALJ's own diagnostic judgments or lay interpretation of the medical data. *Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) ("Neither the ALJ nor this Court has the medical expertise to conclude whether a grossly intact neurological exam or an absence of "erythema" necessarily rules out" a disabling condition), *report and recommendation adopted* 2016 WL 7368676 (N.D. Ohio Dec. 20, 2016). The ALJ's apparent conclusion— that normal neuropsychological testing negates Plaintiff's seizures or their severity thereby undermining Dr. Feudo's opinions—amounts to an impermissible medical determination the ALJ had no expertise to make.

Therefore, the court finds the first assignment of error regarding Dr. Feudo's opinion is well taken, and that a remand is necessary to clarify the decision's treatment of the opinion as well as Plaintiff's alleged seizures.[7]

---

[7] This decision should not be misinterpreted as making any finding regarding whether Plaintiff's alleged seizures, described sometimes as staring spells or periods of disorientation, are supported by the evidence of record. Indeed, the court's recitation of the evidence above includes some treatment notes that suggest a "questionable" history of seizures that were not seen on EEG. (Tr. 560). However, this court does not render medical determinations and, more importantly, the underlying decision's incoherence on this issue requires a remand.

### b. Social Worker Blake

Plaintiff asserts the ALJ's analysis regarding the opinion rendered by social worker Blake was erroneous, concluding that "Ms. Blake's opinion and limitations were consistent and supported by not only her own records, but also by other medical records in the file." (R. 17, PageID# 1024).

Plaintiff's argument—that the medical evidence is actually consistent with the limitations assessed by Ms. Blake—is tantamount to an invitation for this court to reweigh the medical evidence of record and to specifically assign greater weight to the opinion of a social worker, rather than an argument that the ALJ failed to properly explain the reasons for rejecting her opinion under the regulations. Moreover, Plaintiff asserts that "[t]he medical evidence supported and was consistent with Ms. Blake's limitations," but such a contention is not entitled to any weight, as it invites the court to exceed the standard of review and weigh the evidence consistent with Plaintiff's interpretation of the record. This court's role in considering a social security appeal, however, does not include reviewing the evidence *de novo*, making credibility determinations, or reweighing the evidence. *Brainard*, 889 F.2d at 681; *see also Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017) ("Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017).

Furthermore, under the regulations, social workers not only fail to qualify as an "acceptable medical source," but are not considered "medical sources." 20 C.F.R. §§ 404.1513(a)-(d) & 416.913(a)-(d). Nevertheless, an ALJ "generally should explain the weight given to opinions from these 'other sources.'" SSR 06-03p. Again, this explanation requirement

should not be confused with the "good reasons" requirement applicable to acceptable medical sources who have treated a claimant in their professional capacity. *See, e.g., Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016) (observing that a "licensed clinical social worker" is not an "acceptable medical source," and, therefore, rejecting the contention that a social worker's opinion was owed deferential weight); *accord Racz v. Comm'r of Soc. Sec.*, No. 3:15-cv-74, 2016 WL 612536 at *10 (S.D. Ohio Feb. 16, 2016) (finding it was erroneous to categorize a social worker as a "treating source," as "licensed independent social workers are not 'acceptable medical sources'"); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109 (6th Cir. 2010) (finding the "ALJ did not err in failing to include any limitations noted by ... the case manager ... [as] social workers are not acceptable medical sources."); *accord Hayes v. Comm'r of Soc. Sec.*, No. 1:09-cv-1107, 2011 WL 2633945 at *6 (W.D. Mich. June 15, 2011) ("There is no 'treating social worker' rule. Social workers are not 'acceptable medical sources.' Their opinions are not treating-source opinions.") (internal citations omitted).

The ALJ complied with the articulation requirement and explained the weight she ascribed to Ms. Blake's opinion as follows:

> Nancy Blake, LISW completed a medical source statement for the claimant's case on May 11, 2018 after only treating the claimant for approximately two months. (Ex. 17F). She opined that the claimant has many "marked" and "extreme" deficits and explained that he has had multiple episodes of collapse and disengagement in which he is unaware of his surroundings. She also diagnosed him as having PTSD, anxiety, depression and bi-polar disorder. (Ex. 17F/2). Firstly, social workers are not included among the acceptable sources of medical evidence defined in the regulations (20 CFR 404.1513). Therefore, information provided by social workers does not equal in probative value reports from those medical sources shown as being acceptable such as licensed psychologists (20 CFR 404.1513, 404.1527). The findings of acceptable medical sources in this case do not document the existence of a "severe" mental impairment. Secondly, Ms. Blake only discussed the claimant's mental status peripherally as her report was directed more towards the claimant's physical condition. Thirdly, Ms. Blake's opinions are opposite of the claimant's largely unremarkable neuropsychological

> testing, thus rendering such statements less meaningful. (Ex. 6F). For these reasons, the opinion evidence supplied by Ms. Blake with respect to the claimant's functional capacity is rejected and given no weight.

(Tr. 65).

The ALJ has adequately complied with the articulation requirement applicable to non-medical sources and explained why he assessed Ms. Blake's opinion no weight. Plaintiff has not identified any error in the analysis, only disagreement with the outcome. To the extent Plaintiff suggests a heightened or more detailed explanation was required, there is no authority to support such an argument. Finally, the ALJ accorded "great weight" to the opinions of State Agency psychologists Drs. Murry-Hoffman and Fernandez who do constitute acceptable medical sources as defined by the regulations. (Tr. 66). Thus, reading the decision as a whole, it is clear the ALJ opted to assign greater weight to the opinions of psychologists, rather than a social worker, as it relates to Plaintiff's mental functional limitations.

Therefore, Plaintiff's first assignment of error regarding the social worker opinion is without merit.

### 2. Migraine Headaches

In the second assignment of error, Plaintiff asserts the ALJ committed legal error when he designated Plaintiff's migraine headaches as a non-severe impairment. (R. 17, PageID# 1024-1026). The Commissioner argues that any error by the ALJ at Step Two analysis is harmless, because the ALJ continued to address Plaintiff's headaches during the remaining steps of the sequential evaluation. (R. 18, PageID# 1034-1036). Because the court finds a remand is necessary, the court declines to address the merits of this claim in the interests of judicial economy.

## VI. Conclusion

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: September 21, 2021